UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| CARSON RICHARD CASSIDY,<br>   a minor, by and through his<br>   Mother and Next Friend,<br>KAILA MARIA ARANAS CASSIDY,<br><br>                        **Plaintiff,**<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                        **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.: _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff, CARSON RICHARD CASSIDY, a minor, by and through his Mother and Next Friend, KAILA MARIA ARANAS CASSIDY, by counsel, and for his Complaint against Defendant UNITED STATES OF AMERICA, demands judgment in the amount and as set forth below:

### *The Parties*

1. Carson Richard Cassidy ("Carson"), a minor, was born on April 16, 2019 and is the firstborn, infant son of William Raymond Cassidy, III ("William") and Kaila Maria Aranas Cassidy ("Kaila").

2. Carson's father is currently a Sergeant in the United States Marine Corps. ("USMC"), stationed at Naval Submarine Base Kings Bay, located in Kings Bay, Georgia.

3. Carson's mother, Kaila, is his next friend for this legal proceeding.

### *Jurisdiction and Venue*

4. Paragraphs 1 through 3 are restated and incorporated herein by reference.

5. This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680.

6. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

7. Venue is properly laid under the terms of 28 U.S.C. §§ 1391, 1402(b), as the allegedly negligent acts and omissions at issue occurred at Naval Medical Center Portsmouth ("NMCP") which is encompassed by the Norfolk Division of the Eastern District of Virginia.

8. Plaintiff Carson Richard Cassidy, a minor, by and through his Mother and Next Friend, Kaila Maria Aranas Cassidy, commenced his Claim for Damage, Injury or Death (Standard Form 95 attached hereto as **Exhibit A**) on July 16, 2020, a date prior to Carson's tenth birthday. That claim was sent, via email, and received by the Office of the Judge Advocate General on July 16, 2020.

9. Plaintiff Carson Richard Cassidy, a minor, by and through his Mother and Next Friend, Kaila Maria Aranas Cassidy, never received a response to his Standard Form 95 Claim from the Office of the Judge Advocate General, Tort Claims Unit Norfolk.

10. Pursuant to Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2401(b), 2675(a), Plaintiff Carson Richard Cassidy, a minor, by and through his Mother and Next Friend, Kaila Maria Aranas Cassidy, has exhausted his administrative remedies and is now entitled to file suit in this Court to bring forward his claim against the United States of America.

11. At all times relevant to this action, NMCP was a United States Navy medical center located at 620 John Paul Jones Circle, Portsmouth, Virginia, 23708 that provides healthcare services to military members, their families, and military retirees through its physicians, employees, and/or agents.

12. At all times relevant to this action, the United States owned and operated NMCP.

13. At all times relevant to this action, NMCP was an agency of the United States Department of the Navy and the United States of America and is thereby a federal agency whose agents, servants, and employees are federal employees.

14. At all times relevant to this action, the following persons were deemed employees and agents of the United States of America and provided health care and medical treatment to Carson within the course and scope of their employment:

   a. Peter Philip Stuhldreher, LCDR, M.D. (responsible staff surgeon/primary surgeon);

   b. Joseph T. Azzarello, LT, (surgical assistant/Urology resident #1);

   c. Kimberly L. Fischer, LCDR, (surgical assistant/Urology resident #2);

   d. Robert F. O'Donnell, LCDR (anesthesia provider #1);

   e. Grant A. Miller, LT (anesthesia provider #2);

   f. Melissa A. Gillespie CTR, RN (circulating nurse #1);

   g. Margaret Taylor, LT, RN (circulating nurse #2);

   h. Justine Griffin (scrub technician);

   i. Vincenzo Lindley (circulating tech #1);

   j. Marlene Reyes (circulating tech #2);

   k. Carlos A. Robles, LTJG, NC;

   l. Peter N. Carbone, CDR, MC, USN (Pathologist)

15. At all times relevant to this action, all persons listed above were engaged in the practice of medicine and/or nursing at NMCP.

16. At all times relevant to this action, Dr. Peter Philip Stuhldreher was a pediatric urologist/surgeon and was the responsible staff surgeon, primary surgeon, and/or the attending

physician at NMCP responsible for Carson's surgery, medical care, and treatment. Carson and Dr. Stuhldreher had a physician-patient relationship.

17. At all times relevant to this action, Drs. Joseph T. Azzarello and Kimberly L. Fischer were the surgical assistants and/or urology residents at NMCP responsible for assisting Dr. Stuhldreher with Carson's surgery, medical care, and treatment. Carson and Drs. Azzarello and Fischer had a physician-patient relationship.

### Statement of Facts

18. Paragraphs 1 through 17 are restated and incorporated herein by reference.

19. Carson, now 2 years and three months old, suffered severe and permanent injuries and a lifetime of damages following a urologic surgery performed at NMCP on Friday, November 22, 2019.

20. Since May 2020, Carson and his parents have been residents of Yulee, Florida.

21. Following his birth on April 16, 2019, Carson and his parents lived in Jacksonville, NC and he received routine pediatric care and immunizations from various providers at Camp Lejeune Naval Medical Center ("NMC Camp Lejeune") in North Carolina.

22. As a result of Kaila's 20-week ultrasound or "anatomy scan," Carson was diagnosed in utero with a left multicystic dysplastic kidney ("MCDK"), which is a common condition that results from the malformation of the kidney during fetal development, as well as an undescended left testicle.

23. Undescended testicle repair surgery, also known as orchiopexy or orchidopexy, is recommended to be performed between six and twelve months of age, as the testes may descend spontaneously during the first few months of life.

24. Carson was followed by Janelle Ann Fox, M.D., FACS ("Dr. Fox") at NMC Camp Lejeune and she recommended surgery at six months to be done by Peter Philip Stuhldreher, M.D. ("Dr. Stuhldreher"), a pediatric urologist, at NMCP.

25. On October 1, 2019, Carson was seen by Emilie Macaire Collins ("FNP Collins"), a family nurse practitioner in the Family Medicine Clinic at NMC Camp Lejeune for his routine five month, almost six-month, well-check examination and no abnormal findings were noted. Carson's upcoming surgery for an undescended left testicle to be performed at NMCP was referenced in this office visit note.

26. On November 21, 2019, Carson and his parents traveled from Jacksonville, North Carolina to Portsmouth, Virginia so that he could be seen as an outpatient at NMCP in the Urology Clinic for a pre-operative appointment related to his scheduled surgery with Dr. Stuhldreher.

27. On November 21, 2019, Carson's noted "chief complaint" was: "[c]ircumcision, left undescended testicle, MCD K."

28. As indicated by Dr. Stuhldreher, the reason for Carson's visit on November 21, 2019 was:

> This is a 7-month-old male who is previously seen by my colleague Dr. Fox for concern for undescended left testicle in the left MCD K. He be [sic] seen at Mabel [Naval] Medical Center Camp Lejeune at that time and had routine follow-study showing a left MCD K on ultrasound. On exam at that time she was unable to palpate the left testicle however there were tissue structures that felt consistent with spermatic cord structures with concern for atrophic testicle. The right testicle is normal descended a [sic] that time with no evidence of hypertrophy. Since that time he has been doing very well there [sic] parents have not noticed any descent of the left testicle. He is otherwise in normal health.

29. On November 21, 2019, Dr. Stuhldreher physically examined Carson and noted the following in the NMCP record: "Normal phimotic phallus. Unable to appreciate meatus. Normal

5

right testicle that is descended.  Unable to palpate left testicle definitively however there was some tissue in the left groin canal which could be consistent with a testicular nubbin."

30. Following Carson's work-up and physical examination on November 21, 2019, Dr. Stuhldreher spoke to Kaila and William about his surgical plan for their son for the next day.  Per Dr. Stuhldreher, Carson's surgery was to include a "circumcision and diagnostic laparoscopy with possible laparoscopic orchiopexy versus inguinal orchidopexy depending on the laparoscopic findings."  Dr. Stuhldreher also discussed the possibility that Carson could have "a dead atrophic testis or testicular nubbin that would require surgical removal."  Dr. Stuhldreher explained that the surgical plan would be decided "intraoperatively" and "then I would let them know prior to any definitive extra operative surgery."

31. On November 21, 2019, the surgical risks described by Dr. Stuhldreher included "bleeding infection damage to the intra-abdominal contents including bowels and intra-abdominal organs, intra-abdominal vasculature, bladder, testicle, urethra and need for further surgery."

32. As of November 21, 2019, Carson's parents had an understanding that the surgery described by Dr. Stuhldreher might need to be done in two separate surgeries depending on how high up the left testicle was located in the abdomen.  Dr. Stuhldreher was very confident about the chances of success so long as the testicle was viable.  He further advised Kaila and William that if the testicle did not appear viable, he would immediately advise Kaila and William before any further action was taken during the surgery.

33. Although the discussion on November 21, 2019 included various risks related to the surgery and anesthesia, Kaila and William were not advised by Dr. Stuhldreher that there was a risk that Carson's testicle could be ripped or torn out during surgery.

6

34. Following their discussion with Dr. Stuhldreher, Carson's parents agreed to proceed with Carson's surgery the next day to include a "circumcision and diagnostic laparoscopy with possible orchiopexy" – November 22, 2019.

35. On November 22, 2019, Carson underwent a diagnostic laparoscopy, left orchiectomy, and a circumcision performed by Dr. Stuhldreher as the primary surgeon, with the assistance of two assistants or residents: Joseph T. Azzarello, LT and Kimberly L. Fischer, LCDR.

36. Per the NMCP records, anesthesia and nursing commenced at 7:19 a.m., and Carson was brought into OR 11 at 7:29 a.m. The "turn over" to Dr. Stuhldreher was timed at 8:03 a.m. and a time-out was taken at 8:16 a.m. Carson's surgery commenced at 8:18 a.m. and was stopped at 11:03 a.m. Carson left OR 11 at 11:13 a.m., and anesthesia and nursing ended at 11:23 a.m.

37. Following surgery on November 22, 2019, Carson was taken to the PACU for observation and was then discharged home that same day with his parents.

38. During the diagnostic laparoscopy, left orchiopexy, on November 22, 2019, Dr. Stuhldreher identified Carson's left testicle just above the internal ring and dissection followed. The testicle was then "mobilized fairly easily up the lateral body wall incising the peritoneum to get good length. I was able to then remove the left testicle over to the right internal ring as a marker of adequate length for placement into the scrotum." A small scrotal incision was made. At this time, Dr. Stuhldreher indicated that there was "insufficient length to be able to place the testicle into the scrotum" and he "elected to proceed with further mobilization of the testicle and the peritoneum was then incised up to the level of the lower pole of the kidney." Dr. Stuhldreher "then again attempted to place a testicle down in the scrotum with gentle traction and at that time the testicle then [avulsed] from both [its] vascular structures and vas deferens." No active bleeding was noted. All the devascularized tissue was removed and sent to pathology for further analysis.

Upon further inspection of the abdomen, a small serosal tear in the sigmoid colon was identified by Dr. Stuhldreher and repaired with a suture.  This concluded the intra-abdominal portion of the surgery and all ports were removed and closed.  Dr. Stuhldreher then stepped out of the OR to discuss what had just happened with Carson's parents.

39.     As stated in Dr. Stuhldreher's typed operative note: "At this point I stepped out of the operating room to discussed [sic] with the parents the operative findings and the complication of inadvertent orchiectomy."

40.     At this point on November 22, 2019, Carson's surgery had already taken longer than had been expected.  Per Kaila and William, Dr. Stuhldreher seemed upset when he came out of the operating room to speak with them.  Dr. Stuhldreher then apologized for the injury to Carson, stating "I feel like this is all my fault."  Dr. Stuhldreher informed Carson's parents that he thought it was a good testicle and that he had attempted to pull the testicle down into the scrotum but that it did not reach and when he attempted to pull it down a second time, he completely pulled it out.  Kaila and William were stunned and shocked to learn that their son's testicle had just been inadvertently, but permanently removed.  When asked, Dr. Stuhldreher informed Kaila and William that Carson could have a prosthetic placed after puberty for a more symmetrical appearance and that there was no way to tell if the loss of the testicle would affect Carson's fertility at this point in his life.

41.     Following his conversation with Carson's parents on November 22, 2019, Dr. Stuhldreher then asked Kaila and William if he should move forward with the planned circumcision or if they wanted to schedule a subsequent surgery at a later date.  As the circumcision still needed to be performed and Carson was already anesthetized, Kaila and William agreed.

42.     Upon returning to the OR with Carson on November 22, 2019, Dr. Stuhldreher

performed Carson's circumcision, without complication.

43. Dr. Stuhldreher's November 22, 2019 operative report is attached hereto as **Exhibit B.**

44. As part of Carson's Post Procedure Release / Discharge Summary from NMCP on November 22, 2019, there were four procedures listed including: (1) diagnostic laparoscopy, (2) attempted left laparoscopy orchiopexy, (3) left orchiectomy, and (4) circumcision.

45. As part of Carson's Post Procedure Release / Discharge Summary from NMCP on November 22, 2019, the "Clinical Course" noted the following occurrence: "left testicle inadvertently removed during orchiopexy."

46. As part of Carson's Post Procedure Release / Discharge Summary from NMCP on November 22, 2019, the "Details" included the following: "Left testicle found outside of an open left deep inguinal ring. Vas and vessels running into ring. High mobilization of cord/tethering structure up to left lower pole of kidney. Left testicle avulsed during attempt to seat in dartos pouch. Well circumcised phallus."

47. Included within the "Operative Findings" of November 22, 2019 was the following: "Difficult to mobilize left testicle."

48. The pathology results for Carson's left testicle were reported by Peter N. Carbone, CDR, MC, USN on November 26, 2019 and his final diagnosis revealed the following: "Unremarkable epididymis and immature {static phase} testis, negative for malignancy." The gross description indicated that the left testicle was "a tan-gray testis that is 1.8 x 0.7 x 0.5 with attached spermatic cord that is 3.5 cm in length and 0.5 cm in greatest diameter. On section, no gross lesions are identified. The parenchyma is homogenous tan."

49. At the time of Carson's discharge from NMCP on November 22, 2019, his parents

were provided with instructions regarding Tylenol medication for pain/fever, Bacitracin for the head of the penis unless healed, pain control, showering/bathing, activity restrictions, and a follow-up appointment.

50. On November 25, 2019, FNP Collins had a telephone conversation with Kaila and was advised that Carson underwent surgery on November 22, 2019 and that he had a follow-up appointment with her at NMC Camp Lejeune scheduled for tomorrow, November 26, 2019.

51. On November 26, 2019, Carson was seen by FNP Collins at NMC Camp Lejeune in follow-up after having surgery for a circumcision and undescended left testicle. Per FNP Collins' note, Carson's parents reported "that the testicle was actually removed inadvertently during surgery."

52. On November 26, 2019, Kaila and William asked FNP Collins for a referral to a second opinion pediatric urologist as they did not trust Dr. Stuhldreher to see Carson in follow-up.

53. FNP Collins' physical findings on November 26, 2019 were normal, with the exception of the following: abdominal incision sites healing well, circumcision site healing well without signs or symptoms of infection, and the absence of a left testicle.

54. At the conclusion of Carson's November 26, 2019 follow-up visit, FNP Collins' documented "plan" included obtaining a copy of Dr. Stuhldreher's operative report, a repeat visit to Dr. Stuhldreher for follow-up as he had performed Carson's November 22nd surgery, as well as a second opinion referral to another urology specialist.

55. Carson has since been diagnosed with the following: "[a]cquired absence of other genital organ(s)."

56. As Dr. Stuhldreher was unable to return to the clinic at NMC Camp Lejeune in December 2019, Carson did not see him in follow-up.

57. On December 12, 2019, Carson was seen by John Edward Kehoe, M.D. ("Dr. Kehoe") in the urology clinic at NMC Camp Lejeune for a post-operative follow-up appointment on referral from FNP Collins.

58. On December 12, 2019, Dr. Kehoe's physical examination of Carson's penis noted that he had been circumcised and that there was one suture in the frenulum that was unable to be removed, but was trimmed. Dr. Kehoe's physical examination of Carson's scrotum noted a well-healed scrotal incision and an extruded suture that was trimmed. With regard to Carson's testes, Dr. Kehoe noted that his left testis was surgically absent.

59. On December 12, 2019, Dr. Kehoe spoke to Kaila and William about the "steps of FS procedure" and Dr. Stuhldreher's operative note. Dr. Kehoe also noted that he had had a discussion with Dr. Stuhldreher who advised that he would call Carson's parents to answer their questions.

60. In addition, Dr. Kehoe had a further discussion with Carson's parents on December 12, 2019 regarding testosterone and fertility with a "presumably normal right testis" and Carson's need to wear a cup for contact sports when older so as to not injure or damage his remaining right testicle. Dr. Kehoe also spoke with William about a prosthesis which cannot be placed until after Carson reaches puberty.

61. On December 16, 2019, Dr. Stuhldreher spoke to Kaila and his note within the NMCP record stated the following as his explanation for his surgical error:

> **S/O Note** Written by STUHLDREHER,PETER PHILIP @ 16 Dec 2019 1419 EST
> **Subjective**
> A long conversation with Carson's mom today, again, about the consultation of his laparoscopic orchiopexy with avulsion orchiectomy. I discussed with her my findings and operative approach again at the time for plan for a 1 stage repair. We did discuss a two-stage Fowler Stephens repair on the rationale behind that for very high testicles. Given that his was low just above the internal ring I felt appropriate for a 1 stage orchiopexy and explained by rationale. I also did explain to her that after performing skeletonization of the vessels and the vas deferens for planned first stage repair, trying to do a 2-stage repair with division of the vessels of that time almost always portends a very poor outcome with testicular atrophy due to disruption of collateral flow and lack of time for the differential blood supply to develop. I also discussed with her that despite the pathology this was likely a nonsurvivable testis due to the lack of bleeding after avulsion from the omental vessels. I assume that it was surviving on collateral vessels taken off from the body wall at its positioning which would be disrupted during the dissection for orchiopexy and that I would expect this testicle would likely atrophy within the scrotum were able to place it down there due to insufficient supply from either the vas deferens or its native testicular artery due to the lack of bleeding afterwards. I also discussed with her that I was confident that I did not inadvertently transect the vessels or the vas deferens prior to the avulsion. I'm still surprised with the avulsion as it was not putting undue tension on the testicle and I also checked twice that the testicle could easily stretch to the contralateral inguinal ring which should give us significant length to be able to place the testis into the scrotum. In retrospect, my thought processes that due to the lack of appropriate vasculature, the vascular lacked its normal last stitch to be and therefore would not stretch appropriately for placement within the scrotal. Again, I am very disappointed that I was not able to complete the surgery as planned and at least given the chance with a laparoscopic orchiopexy, however, I am reasonably confident that this was not a survivable testis. I discussed with her that I would be happy to talk with her and her husband again if they needed further clarification or further understanding of the surgery and a complication and I have review sleep provided them with my cell phone number as a means to contact me. I will plan to see them back in follow-up mechanically and for myA light clinic.

62. Dr. Stuhldreher's December 16, 2019 Note is attached hereto as **Exhibit C.**

63. On December 17, 2019, Carson was seen by Mary I. Buskohl, MSN, RN, IBCLC, Supervisory Nurse Specialist at Naval Hospital Jacksonville ("NH Jacksonville") for his routine, six-month pediatric follow-up appointment and immunizations. Carson was an otherwise healthy, eight-month old infant.

64. As of July 2021, Carson continues to be seen regularly for "well child checks" in Florida and remains otherwise healthy.

*Count I - Negligence*

65. Paragraphs 1 through 64 are restated and incorporated herein by reference.

66. Federal employees of the United States working at NMCP, acting within the scope of their employment and other persons for whose conduct the United States of America is legally responsible, including but not limited to Dr. Stuhldreher, owed Carson Cassidy a standard-of-care duty to perform all medical and nursing care and treatment with the same degree of skill and diligence that would be used by reasonably prudent physicians, nurses, and health care providers under the same or similar circumstances.

67. Federal employees of the United States working at NMCP, acting within the scope of their employment and other persons for whose conduct the United States of America is legally responsible, including but not limited to Dr. Stuhldreher, his assistants/residents, and/or other agents, servants, and/or employees of NMCP, were negligent in the care and treatment they provided to Carson Cassidy and breached the applicable standards of care for reasonably prudent health care providers.

68. The negligent acts or omissions of Federal employees of the United States working at NMCP, acting within the scope of their employment and other persons for whose conduct the United States of America is legally responsible include, but are not necessarily limited to, one or more of the following negligent acts, as applicable:

(a) failure to properly perform the left laparoscopic orchiopexy on November 22, 2019 so as to avoid injury to Carson;

(b) failure to perform the left laparoscopic orchiopexy in stages or separate surgeries as was discussed with Carson's parents preoperatively so as to avoid injury to Carson on November 22, 2019;

(c) failure to properly mobilize Carson's testicle during the left laparoscopic orchiopexy on November 22, 2019 so as to avoid injury to Carson;

(d) failure to preserve Carson's testicle during the left laparoscopic orchiopexy on November 22, 2019 so as to prevent its complete removal; and

(e) failure to take any other actions as may be shown at the trial of this matter.

69. Had the health care providers employed by the United States of America and their agents, including but not limited to Dr. Stuhldreher, his assistants/residents, and/or other agents, servants, and/or employees of NMCP, complied with the standard of care during Carson's surgery

on November 22, 2019, his testicle would not have been permanently removed from his body.

### *Damages*

70. Paragraphs 1 through 69 are restated and incorporated herein by reference.

71. As a direct and proximate result of the negligent breaches of the standard of care set forth above, Carson Cassidy suffered the following injuries and damages in the past and is reasonably expected to suffer injuries and damages into the future:

    a. bodily injuries;

    b. physical pain and suffering;

    c. disfigurement and deformity and any associated humiliation or embarrassment;

    d. mental anguish, emotional distress, peer ridicule and self-image problems;

    e. medical and related expenses upon turning the age of 18 and thereafter;

    f. life care costs upon turning the age of 18 and thereafter;

    g. inconvenience and disruption of his activities of daily living;

    h. disruption of the enjoyment of his life;

    i. and other general and special damages upon turning the age of 18 and thereafter to be shown at the trial of this matter.

72. Plaintiff reserves the right to amend these pleadings as necessitated by discovery.

WHEREFORE, the Plaintiff, CARSON RICHARD CASSIDY, a minor, by and through his Mother and Next Friend, KAILA MARIA ARANAS CASSIDY, respectfully prays for judgment in his favor and an award of execution against the Defendant UNITED STATES OF AMERICA, in the sum of THREE MILLION DOLLARS ($3,000,000.00), with pre-judgment

interest at the legal rate from November 22, 2019, pursuant to Virginia Code § 8.01-382 and 28 U.S.C. § 1961, taxable costs, and for such other general and special relief as the Court may deem appropriate.

Respectfully submitted,

**CARSON RICHARD CASSIDY, a minor,
by and through his Mother and Next Friend,
KAILA MARIA ARANAS CASSIDY,**

By: \_\_S/ Stephanie E. Grana_____
Stephanie E. Grana, Esq. (V.S.B. #35736)
Elliott M. Buckner, Esq. (V.S.B. #45227)
M. Scott Bucci, Esq. (V.S.B. #42636)
Jeffrey N. Stedman, Esq. (V.S.B. #84496)
Breit Cantor Grana Buckner, PLLC
7130 Glen Forest Drive, Suite 400
Richmond, Virginia 23226
Telephone: (804) 343-4372
Facsimile: (804) 644-9205
sgrana@virginiatrialfirm.com
ebuckner@breitcantor.com
sbucci@breitcantor.com
jstedman@breitcantor.com
*Counsel for Plaintiff*